JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Carrie Shaver

**DEFENDANTS**

Hartford Life and Accident Insurance Company and Life Insurance Company of North America

**(b)** County of Residence of First Listed Plaintiff    (formerly Morris)
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Sara Elizabeth Kaplan, Esq.
Law Offices of Barbara B. Comerford, P.A.
45 Eisenhower Drive, Suite 280, Paramus NJ 07652, (201) 444-4493

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability |  |  | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander |  | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine |  | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | ☐ 370 Other Fraud | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice |  | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 196 Franchise |  |  | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☒ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | ☐ 891 Agricultural Acts |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | ☐ 893 Environmental Matters |
| | | ☐ 550 Civil Rights | | ☐ 895 Freedom of Information Act |
| | | ☐ 555 Prison Condition | | ☐ 896 Arbitration |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| | | | | ☐ 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 U.S.C. Section 1132(a)(1)(B)
Brief description of cause:
Lawsuit following denial of Long Term Disability benefits

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE
12/06/2019

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**    **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**    **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**    **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**    **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**    **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**    **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: <u>Nature of Suit Code Descriptions</u>.

**V.**    **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**    **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**    **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**    **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**Law Offices of Barbara B. Comerford, P.A.**
**A Professional Corporation**
**45 Eisenhower Drive, Suite 280**
**Paramus, NJ 07652-1452**
**201-485-8806**
**Attorneys for Plaintiff Carrie Shaver**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **CARRIE SHAVER,** | Civil Action No. |
| **Plaintiff,** | |
| **vs.** | **COMPLAINT** |
| **HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY and LIFE INSURANCE COMPANY OF NORTH AMERICA ,** | **ECF** |
| **Defendants.** | |

Plaintiff, by way of Complaint against the Defendants alleges as follows:

## THE PARTIES

1.     At the time the events described herein arose, Plaintiff Carrie Shaver ("Plaintiff" or "Ms. Shaver") was a resident of the State of New Jersey, with a residence located at 19 Cascade Way, Butler, NJ 07405.

2.     Defendant, Hartford Life & Accident Insurance Company (hereinafter "Hartford") is an insurance company and corporation organized and existing under the laws of the State of Connecticut, with a headquarters located at 1 Hartford Plaza, Hartford, Connecticut 06155.

1

3.     Defendant Life Insurance Company of North America (hereinafter "LINA") is an insurance company organized and existing under the laws of the Commonwealth of Pennsylvania, with a principal place of business being 1601 Chestnut Street, Philadelphia, PA, 19192.

4.     Atlantic Health System, Inc. ('Atlantic Health") is Plaintiff's former Employer. Atlantic is a corporation organized and existing under the laws of the State of New Jersey, with a headquarters located at 475 South Street, Morristown, NJ 07690.

5.     By virtue of her employment with Atlantic Health, Ms. Shaver was eligible to participate in Group Policy No. GLT-696960 (Exhibit A) (hereinafter "the Hartford Policy").

Under the terms of The Hartford Policy, Atlantic Health was the policyholder and plan administrator and had designated The Hartford as claims fiduciary to evaluate claims and pay benefits under The Hartford Policy.

6.     As of January 1, 2017, the Hartford ceased to be the Long Term Disability insurer of Atlantic Health.

7.     As of January 1, 2017, LINA became the Long Term Disability insurer of Atlantic Health and the Atlantic Plan.

8.     By virtue of her employment with the Company as of January 1, 2017, Ms. Shaver was eligible to participate in Group Policy No. VDT-980162 (Exhibit B) (hereinafter "the LINA Policy"). Under the terms of the LINA Policy, the Trustee of the Group Insurance Trust for Employers in the Services Industry ("Trustee") is the policyholder. Atlantic Health is a subscriber to the Group Insurance Trust for Employers in the Services Industry and Plan Administrator as to Atlantic Health's employees insured under the LINA Policy.

9.     The Trustee has designated LINA as claims fiduciary to evaluate claims and pay benefits under the LINA Policy.

2

10.     Under the terms of the LINA Policy, LINA is the insurer and claims administrator and responsible for paying Long Term Disability benefits under the policy.

11.     At all times herein relevant, The Hartford and/or LINA were and are fiduciaries under The Hartford Policy and the LINA Policy respectively pursuant to ERISA, 29 U.S.C. § 1002(21)(A).

## JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) in that the claims herein arise under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132 et. seq., and the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) or (b)(3) and (c)(2) in that a substantial part of the events and omissions giving rise to the claims herein occurred in New Jersey.

## POLICY TERMS

14.     The Hartford Policy contains the following definition of disability:

**Disability** or **Disabled** means You are prevented from performing one or more of the Essential Duties of:

1)      Your Occupation during the Elimination Period;
2)      Your Occupation, for the 24 month(s) following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-Disability Earnings; and
3)      after that, Any Occupation.

15.     The Hartford Policy defines "essential duties" as follows:

**Essential Duty** means a duty that:

1)      is substantial, not incidental;
2)      is fundamental or inherent to the occupation; and
3)      cannot be reasonably omitted or changed.

3

Your ability to work the number of hours in your regularly scheduled work week is an Essential Duty.

      16. The Hartford Policy defines "Your Occupation" as follows:

**Your Occupation** means Your Occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job You are performing for a specific employer.

      17. The Hartford Policy defines "Any Occupation" as follows:

**Any Occupation** means any occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than the lesser of:

1) The product of Your Indexed Pre-disability Earnings and the benefit percentage; or
2) The Maximum Monthly Benefit.

      18. The Hartford  Policy defines 'Recurrent Disability" as follows:

**Recurrent Disability**: *What happens if I Recover but become Disabled again?*
Periods of  Recovery during the Elimination Period will not interrupt the Elimination Period, if the number of days You return to work as an Active Employee are less than one-half (1/2) the number of days of Your Elimination Period.

      19. The LINA Policy contains the following definition of disability:

**Definition of Disability/ Disabled**

The Employee is considered Disabled if solely because of Injury or Sickness, he or she is
1. Unable to perform the material duties of his or her Regular Occupation; and
2. Unable to earn 80% or more of his or her Indexed Earnings from working his or her Regular Occupation.

After Disability Benefits have been payable for 24 months, The Employee is considered disabled if, solely due to Injury or Sickness, he or she is:
1. Unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training, or experience; and
2. Unable to earn 60% or more of his or her Indexed Earnings.

      20. The LINA Policy defines "Regular Occupation" as follows:

**Regular Occupation**

The occupation the Employee routinely performs at the time the Disability begins.  In evaluating the Disability, the Insurance  Company will consider the duties of the occupation as it is normally performed in the general labor market in the national economy.  It is not work tasks that are performed for a specific employer or at a specific location.

21.   The LINA Policy contains a Takeover Provision for "Employees eligible under this Policy who were covered for long term disability coverage on the day prior to the effective date of this Policy under the Prior Plan provided by the Policyholder or by an entity that has been acquired by the Policyholder."

22.   The Takeover Provision in the LINA Policy provides, "Except for any amount of benefit in excess of a Prior Plan's benefits, the Pre-existing Condition Limitation will not apply to an Employee covered under a Prior Plan who satisfied the pre-existing condition limitation, if any, under that plan. If an Employee, covered under a Prior Plan, did not fully satisfy the pre-existing condition limitation of that plan, credit will be given for any time that was satisfied under the Prior Plan's pre-existing condition limitation."

## FACTS APPLICABLE TO ALL COUNTS

23.   Ms. Shaver is a 46 year-old woman.

24.   After raising her family from a young age as a single mother, Ms. Shaver went to college.

25.   Ms. Shaver obtained an Associate's Degree in Surgical Technology in 2014.

26.   From 2015 to the time of her disability, Ms. Shaver worked exclusively as a Surgical Technologist at Atlantic Health.

27.   As a surgical technologist, Ms. Shaver was responsible for maintaining a safe environment for patient care in the operating room by operating surgical equipment, moving patients, and maintaining a sterile field.

28.   Ms. Shaver's occupation had a significant physical component. Ms. Shaver was required to retract and hold heavy instruments including electrocautery devices, twist and turn to keep the surgical field lit, hold open patients' abdominal cavities or other surgical areas using

5

retractors, hold up body parts while surgeons were operating, and hand the surgeon surgical instruments in the proper positions. She was responsible for cleaning the operating room after surgery, which included lifting garbage bags, putting equipment away, cleaning machinery, sucking fluids away from the field, and moving and manipulating x-ray machines and removing radioactive materials from the surgical field.

29.     Ms. Shaver's occupation was fast-paced, high pressure, and required constant multitasking. There was no room for error, or for being less than intact either physically or cognitively.

30.     On September 8, 2016, Ms. Shaver was working in the operating room and preparing a bariatric patient for surgery. Specifically, Ms. Shaver was dragged across a stretcher. She immediately felt pain from her mid shoulder to her right leg.

31.     When Ms. Shaver got home from work on September 8, 2016, she could not lift her legs to get out of her car.

32.     Ms. Shaver's partner picked Ms. Shaver up out of the car and took her to Chilton Medical Center. There, an x-ray was performed but no other imagining, so Ms. Shaver was only diagnosed with a lumbar sprain.

33.     Ms. Shaver attempted to return to work on September 9, 2016. However, she was in such extraordinary pain that she was instructed to visit occupational medicine at Chilton Medical Center. From there, a worker's compensation case was opened, and Ms. Shaver was referred to Orthopedic Surgeon Carl Giordano, M.D. for evaluation of her spinal injuries.

34.     Dr. Giordano first evaluated Ms. Shaver on September 20, 2016. He noted that Ms. Shaver had pain radiating down her leg and that she had been on a Medrol Dosepak, muscle relaxant, and Percocet and yet still had severe back pain radiating down the right leg. He noted

that she was presently out of work due to her injuries. He noted reduced range of motion of the lumbar spine, with no extension. Right straight leg raise was positive at 40 degrees. He noted that she would be undergoing a lumbar MRI to better ascertain the origin of her pain, yet he did state, "There does appear to be causal relationship to the injury described by the patient and the symptoms for which treatment is rendered."

35.     Ms. Shaver underwent an MRI of the lumbar spine on September 21, 2016. The scan revealed a central left disc herniation at L4-5, broad disc protrusion at L5-S1, and facet arthropathy involving the lower lumbar spine. When Ms. Shaver returned to Dr. Giordano on September 23, 2016, he noted the results of the MRI and noted that the disc herniation at L4-5 "is most likely causing her back pain by distending the annulus as well as her leg pain in both legs from neural compression." He noted that she remained in significant pain despite the use of Percocet and Flexeril and that her range of motion remained limited. He noted, "I advised this woman to undergo a lumbar epidural. Her pain level is fairly high.  She is struggling just to give it a little bit of time….In the meantime she will continue with the Percocet for her pain.  She is in too much pain for any type of therapy just now."

36.     At Dr. Giordano's recommendation, Ms. Shaver underwent an intralaminar epidural steroid injection on October 10, 2016 at New Jersey Pain Consultants at Morristown Medical Center (New Jersey Pain Consultants is a part of Atlantic Health System, Ms. Shaver's former employer), but it did not provide sufficiently lasting relief. She returned to Dr. Giordano on October 18, 2016, and he noted, "She still appears to be very uncomfortable and has difficulty getting up and down from a seated position."

37.     Dr. Giordano advised that Ms. Shaver undergo a second epidural, which she did undergo on October 31, 2016 with Michael Rudman, MD of New Jersey pain consultants.

38.    Ms. Shaver remained disabled by her pain, which she continued to report to Dr. Giordano. On November 9, 2016, she returned to him and reported back pain with bilateral lower extremity dysesthesias (abnormal sensations). She also reported neck pain and upper left extremity dysesthesias, which is especially disabling as Ms. Shaver is left-handed. Despite the obvious abnormalities in her spine that he had previously conceded were causing her pain, he now claimed that she was neurologically intact and that her pain was somehow now, all of a sudden, merely "subjective."

39.    Due to Dr. Giordano's position. Ms. Shaver's Workers Compensation payments ceased effective November 20, 2016 and she was sent back to work at sedentary capacity, on desk duty effective November 21, 2016. Left without a choice but to do what she felt she must to support her family, Ms. Shaver complied with the order to desk duty.

40.    Ms. Shaver returned to Dr. Giordano on December 2, 2016. Dr. Giordano noted that she continued have what he called "a high perceived pain level" which would subsequently result in her Workers Compensation case being reinstated. He also ordered her to begin physical therapy, which she did commence at Atlantic Rehab. She continued to report significant pain, and Dr. Giordano noted that she would be trying a different pain medication, Ultram.

41.    Dr. Giordano wrote to PMA, Atlantic Health's Workers' Compensation administrator, and incorrectly advised that Ms. Shaver's neck complaints were not related to her work injury. Lacking the support of the only physician who could opine on the matter, and under tremendous financial pressure and fearing she would lose her job and become unable to support her family, Ms. Shaver did return to ordinary duty effective December 19, 2016.

42.     Despite her condition and severe pain, Ms. Shaver attempted to work through December January and into the beginning of February 2017. However, in February 2017, the effects of pushing her body while she was not fit to do so took their toll.

43.     On February 10, 2017, Ms. Shaver felt a pop in her beck while working with handheld tools in the OR and immediately experienced excruciating pain. She left work and went to the OR at Overlook Medical Center, reporting pain as a 10 on a scale of 0-10. Pain was sharp and she could do nothing to relieve it. She reported neck pain, spasms, paresthesia's and sensory changes. Sensation was diminished to the left ulnar hand. On physical examination, range of motion was limited with midline tenderness to the paraspinal muscles. Spurling test was positive.

44.     Ms. Shaver underwent an MRI of the cervical spine while in the ER. The scan revealed canal stenosis at C5-6 from left-sided predominant disc protrusion encroaching on the canal and nerve root entry zone; spondylosis at C5-7; bulging disc at C4-5;  and paracentral protrusion at C6-7 with canal narrowing.

45.     Unable to avoid that she was absolutely disabled and need of medical care, Ms. Shaver ceased working entirely as of February 10, 2017.  She advised her employer of her medical situation and her inability to work, and was referred to neurosurgeon Jonathan Baskin at Atlantic Neurosurgical Specialists.

46.     Dr. Baskin ordered an MRI, which confirmed lumbar radiculopathy in addition to the cervical radiculopathy confirmed at the Overlook Medical Center emergency department.  Dr. Baskin confirmed that Ms. Shaver was disabled when he completed a form in support of her FMLA leave. He noted she was disabled due to her severe neck, lower back, arm and leg pain. He wrote, "she is unable to perform all job functions at this time."

47.    Ms. Shaver then, through counsel, filed a motion in Workers Compensation court, which noted "Upon release from authorized medical care and return to work, Petitioner continued to have severe and debilitating complaints to the neck and low back." Upon the order of the Workers Compensation judge, Ms. Shaver's case was reopened and she began to receive payment retroactive to the day after she saw Dr. Baskin.

48.    Ultimately, the Workers' Compensation judge ordered Ms. Shaver restored to claim and to medical care.

49.    On April 6, 2017, Ms. Shaver returned to Dr. Rudman for reevaluation. He recommended a repeat epidural steroid injection.

50.    Ms. Shaver returned to Dr. Giordano on April 12, 2017. Dr. Giordano wrote, "I did have a chance to review her MRI that was recently performed dated February 10, 2017. The MRI reveals her to have an L4-5 central disc herniation with some degenerative disc disease. There is indeed nerve compression. She has continued complaints in the back radiating into the legs. She has been symptomatic now for about 7 months. She has been unresponsive to steroids, anti-inflammatories and two epidurals...she does have pathology that correlates with her symptoms." He wrote, "There does appear to be causal relationship to the injury described by the patient and the symptoms for which treatment is rendered."

51.    Dr. Giordano now agreed, "This woman does want to proceed with a microdiscectomy at L4-5 on the right side. Her right side bothers her more than the left. I do think it is an appropriate treatment option for her. She has been symptomatic for a long period of time and has tried to avoid surgery and has given conservative care a good time period."

52.    Ms. Shaver did undergo the repeat epidural on April 17, 2017. However, this did not provide relief.

53. Conservative treatment methods having failed, Ms. Shaver underwent a right L4-L% microdiscectomy, foraminotomy and laminotomy; and microdissection of the nerve roots.

54. Dr. Giordano evaluated Ms. Shaver post-operatively on June 6, 2017. She remained out of work and was still in pain less than three weeks after surgery. When Ms. Shaver returned to Dr. Giordano on July 11, 2017 reporting continued pain in the legs, he wrote that the pain appeared "more musculoskeletal in origin." He wrote, "This woman is going to avoid bending, lifting and twisting and allow the surgical site to heal. " In other words, she remained disabled from her own occupation.

55. Ms. Shaver resumed seeing her primary care physician, Fuad Ahmad, M.D. on June 17, 2017. At the June 17, 2017 visit, he noted tender back pain, and that her pain following the surgery was severe. When Ms. Shaver returned to his office on July 21, 2017, he noted continued pain in the back and neck that was interfering with sleep. Yet, clearly concerned that Ms. Shaver might be suffering from a comorbid condition, he ordered labs for, inter alia, EBV and Lyme.

56. Dr. Ahmad spoke with Ms. Shaver about the possibility that she may be suffering from Fibromyalgia.

57. After evaluating Ms. Shaver on August 30, 2017, Dr. Giordano wrote to Dr. Ahmad, "She does appear miserable and she does have these diffuse neurologic complaints. She indicated to me that you think she may have a diagnosis of fibromyalgia. I am in agreement with something like that."

58. Ms. Shaver visited rheumatologist Anil Kapoor, M.D., who diagnosed her with Fibromyalgia.

59. Ms. Shaver continued to treat with Dr. Kapoor, who noted that she was under his care for fibromyalgia and cervical disc disease.

11

60.     Ms. Shaver continued to suffer disabling pain in her cervical spine, for which she began treating with Dr. Charles A. Gatto, M.D. Dr. Gatto is a partner at the Advanced Spine Center and chief of the spine section for the department of orthopedic surgery at Morristown Medical Center, in Morristown, NJ.

61.     Ms. Shaver continued to treat with Dr. Gatto and to undergo multiple injections aimed at pain relief including trigger point injections in the trapezius.

62.     On August 29, 2018, Dr. Gatto performed an anterior cervical discectomy and spinal cord nerve root decompression at C5-C6 and C6-7 with anterior interbody fusion, porous titanium cage spacer, and structural allograft bone dowel and bone gel.

63.     Following her surgery, Ms. Shaver continued to treat with Dr. Gatto and Dr. Kapoor.

64.     On March 29, 2019, Dr. Kapoor's physical exam indicated that Ms. Shaver was in significant pain. The doctor commented that it was "amazing she takes only two Percocets a day". Physical exam indicated trapezius interscapular tender trigger spots, peripheral fibromyalgia trigger spots present in all locations and very tender. Additionally, she has tenderness over the wrist, MCP and PIP ankle joints.  Dr. Kapoor found she had chronic intractable fibromyalgia with daily persistent pain and painful osteoarthritis in multiple sites.  Dr. Kapoor commented that Ms. Shaver has been a "therapeutic challenge and failure. She has not had any relief with gabapentin." She increased her dosage of Amitriptyline and she was to continue gabapentin, Plaquenil and Percocet as needed.

65.     On April 15, 2019, Dr. Ahmad provided a letter stating that Ms. Shaver remained disabled as he continued to treat her for her rheumatologic conditions.

66.     Ms. Shaver has been evaluated by Richard Podell, M.D. Dr. Podell is a nationally renowned and highly respected expert in the diagnosis and treatment of Fibromyalgia and the

12

illness that frequently coincides with it, Myalgic Encephalomyelitis/ Chronic Fatigue Syndrome ("ME/CFS").

67.     Upon his personal and objective evaluation of Ms. Shaver, Dr. Podell documented all 18 out of 18 tender points associated with Fibromyalgia as painful; orthostatic hypotension, a hallmark of ME/CFS; abnormal Rhomberg test demonstrating difficulty balancing; reduced muscle strength; a high number of objectively palpable trigger points, which are areas of muscle spasm the number of which closely correlates with the level of Fibromyalgia-related disability.

68.     Dr. Podell administered the Fibromyalgia Impact Questionnaire Revised ("FIQR"), the American College of Rheumatology's gold standard for assessing disability due to Fibromyalgia, to Ms. Shaver. Ms. Shaver's scores on the FIQR were highly elevated. Dr. Podell noted that "Persons with FIQR scores in this very high range are generally not able to sustain the activity required for any job that is reasonably available in the economy."

69.     Based upon her medical history and his personal evaluation of Ms. Shaver, Dr. Podell diagnosed Fibromyalgia and ME/CFS.

70.     Dr. Podell concluded that Ms. Shaver was disabled from her own and any other occupation. Dr. Podell concluded, "Because of current limitations of our treatments for chronic fatigue syndrome and fibromyalgia her disability is likely to be permanent."

71.     On June 19, 2019, Ms. Shaver underwent neuropsychological testing with Gudrun Lange, Ph.D.

72.     Dr. Lange is a clinical neuropsychologist with renowned expertise in assessing the cognitive effects of ME/CFS in patients suffering from the illness. She is an Associate Professor at Rutgers New Jersey Medical School.

13

73.     Dr. Lange performed a thorough battery of neuropsychological testing on Ms. Shaver.

74.     Validity testing revealed that Ms. Shaver put forth her full effort on Dr. Lange's neuropsychological testing.

75.     Dr. Lange's testing objectively revealed impairments in memory, with scores in the low average and impaired range including impaired visual memory; visuospatial abilities; attention; motor skills bilaterally (manual dexterity less than the 1st percentile and grip strength and tapping tasks not administered due to severe pain); response inhibition and color naming with scores lower than the 1st percentile and word reading speed in the 5th percentile; mental flexibility; and processing speed.

76.     Dr. Lange concluded:

It is my neuropsychological opinion that Ms. Shaver is not able to work in any position due to her combined physical and cognitive limitations.  The findings of the current evaluation show with a reasonable degree of neuropsychological certainty that Ms. Shaver will not be able to:

- Work efficiently as she is only able to concentrate and sustain attention for short periods of time affecting learning and memory of new information.
- Work effectively on any time sensitive tasks and complete them in a timely and accurate manner as speed of information processing is impaired.
- Work on projects requiring abstract thinking and mental flexibility under time pressure.
- Work in a standing or sitting position for a long time.
- Work using her hands.

## PLAINTIFF'S CLAIM WITH LINA

77.     Paragraphs 1-76 are hereby incorporated as if fully set forth herein.

78.     After ceasing a final time in February 2017, Plaintiff filed a claim for Long Term Disability benefits with LINA under Policy Number VDT-0980162.

14

79. The LINA Policy contains a Takeover Provision extending coverage to "Employees eligible under this Policy who were covered for long term disability coverage on the day prior to the effective date of this Policy under the Prior Plan provided by the Policyholder or by an entity that has been acquired by the Policyholder."

80. Among other specific features, the Takeover Provision (1) waives the pre-existing condition limitation for employees who, as Ms. Shaver did, satisfied the pre-existing condition limitation under the prior Long Term Disability Policy, and (2) waives or shortens the elimination period for a disability beginning under the LINA policy that "results from the same or related causes as a Disability for which monthly benefits were payable under the Prior Plan," where "[b]enefits are not payable for Disability under the Prior Plan solely because it is not in effect."

81. Plaintiff was covered under the Hartford Policy until December 31, 2016 because she was either disabled under the terms of the Hartford Policy or actively working until December 31, 2016.

82. The Hartford has refused to extend benefits to Ms. Shaver for her disability on the grounds that The Hartford was no longer Ms. Shaver's LTD carrier when she left work permanently in February 2017.

83. Upon information and belief, LINA received and accepted premium payments from Ms. Shaver as necessary for Ms. Shaver to enroll in coverage under the LINA Policy as of January 1, 2017.

84. When LINA became Atlantic Health System's Long Term Disability carrier on January 1, 2017, Ms. Shaver was immediately covered under the LINA Policy since she had not ceased to be covered under Atlantic Health's prior Long Term Disability policy with the Hartford.

85.    Ms. Shaver was covered for her disability under the LINA policy at the time she ceased working in February 2017.

86.    Despite the terms of the LINA policy and the substantial evidence of record, LINA denied Ms. Shaver's Long Term Disability claim by taking the position that although Ms. Shaver left work for a second time in February 2017, her disability began before LINA became Atlantic Health's Long Term Disability carrier.

87.    LINA took the position that Ms. Shaver was not eligible for coverage for her disability because it found her disability to have begun prior to the effective date of Atlantic Health's contract with LINA.

88.    Plaintiff, via counsel, filed an appeal of LINA's denial. This appeal discussed the terms of LINA's contract, its Takeover Provision, and the reasons why LINA was responsible for Plaintiff's disability.

89.    The appeal also set forth the substantial medical evidence of Ms. Shaver's disability.

90.    Despite the terms of the LINA Policy and the substantial evidence of record, LINA upheld its denial of Plaintiff's claim and maintained that she was not eligible for coverage for her disability.

91.    In denying benefits to Ms. Shaver, LINA relied upon the "Successive Periods of Disability" provision in the LINA Policy, which provides that "a separate period of Disability will be considered continuous" where the successive period "results from the same or related causes as a prior Disability for which benefits were payable" and where "after receiving Disability Benefits, you return to work in your Regular Occupation for less than 6 consecutive months."

92.     LINA has denied Ms. Shaver's benefits by stating that it is a recurrent or continuous disability with an initial occurrence of disability at a time when The Hartford was the applicable Long Term Disability insurer.

93.     As set forth below, Hartford has denied Ms. Shaver's benefits despite the fact that Ms. Shaver's disability is a recurrent or continuous disability under the terms of The Hartford Policy. In other words, Hartford has denied  Ms. Shaver's claim because Ms. Shaver's recurrent or continuous disability did not recur until a time when LINA, and not Hartford, was the applicable Long Term Disability insurer.

94.     LINA is liable for Ms. Shaver's long term disability benefits under the terms of the LINA policy.

95.     If Hartford is not ordered to pay Ms. Shaver's Long Term Disability benefits, LINA should be ordered to pay Ms. Shaver's Long Term Disability benefits.

96.     Plaintiff has exhausted her administrative remedies under the LINA Policy.

### PLAINTIFF'S CLAIM WITH THE HARTFORD

97.     Paragraphs 1-96 are hereby incorporated as if fully set forth herein.

98.     In denying benefits to Ms. Shaver, LINA advised Plaintiff, "You may be eligible for Long Term Disability (LTD) benefits under your employer's previous LTD carrier.  Please contact your employer to obtain information on how to file a claim with your previous LTD carrier."

99.     Ms. Shaver contacted her employer to obtain information on how to file a Long Term Disability claim with The Hartford.

100.    Ms. Shaver  filed a Long Term Disability claim with Hartford.

101.    Hartford denied Ms. Shaver's Long Term Disability claim and noted that The Hartford Policy canceled on January 1, 2017.

17

102.   Hartford contended that Ms. Shaver was not covered for her disability because she did not leave work the second time until February 2017 when Hartford was no longer Atlantic Health's Long Term Disability carrier.

103.   Under Hartford's recurrent disability provision, a disability will be treated as recurrent if the days that an employee returns to active work "are less than one-half (1/2) the number of days of [the] elimination period."

104.   The elimination period under the Hartford Policy is 180 days.

105.   After her disability in September 2016, Ms. Shaver worked desk duty and then returned to work in her own occupation for less than 90 days before she left work on disability for a second time.

106.   As a result, Ms. Shaver's disability falls under the Hartford policy's recurrent disability provision, which means that her disability related back to September 2016 when she left work for the first time.

107.   Hartford is liable for Ms. Shaver's disability under the terms of The Hartford Policy.

108.   If LINA is not ordered to pay Ms. Shaver's Long Term Disability benefits, Hartford should be ordered to pay Ms. Shaver's Long Term Disability benefits.

109.   Ms. Shaver, via counsel, filed an appeal of Hartford's denial of Ms. Shaver's claim.

110.   The appeal discussed the terms of the Hartford Policy, the Hartford Policy's Recurrent Disability provision, and the reasons why The Hartford is responsible for Plaintiff's disability.

111.   The appeal also set forth the substantial medical evidence of Ms. Shaver's disability and the fact that when Ms. Shaver returned to her own occupation between December 2016 and

February 2017, she did so under financial distress because Atlantic Health's workers' compensation carrier stopped her benefits.

112. Despite the substantial evidence of record, Hartford upheld its denial of Ms. Shaver's Long Term Disability claim.

113. Ms. Shaver has exhausted her administrative remedies under the Hartford Policy.

## AS FOR A FIRST CAUSE OF ACTION

114. Paragraphs 1-113 are hereby incorporated as if fully set forth herein.

115. Ms. Shaver has exhausted her administrative remedies under both the LINA Policy and the Hartford Policy.

116. LINA and Hartford have disclaimed coverage for Long Term disability benefits to Ms. Shaver.

117. A controversy therefore exists between Ms. Shaver, LINA, and Hartford under the respective LTD policies.

118. The controversy between the parties includes, but is not limited to the fact that Hartford has claimed that the disability that is the subject of this litigation commenced at a time when LINA was Atlantic Health's Long Term Disability insurer, while conversely LINA has claimed that the disability that is the subject of this litigation commenced at a time when Hartford was Atlantic Health's Long Term Disability insurer.

119. By reason of the foregoing, a Declaratory Judgment is both necessary and proper in order to set forth and determine the rights, obligations and liabilities that exist between the parties in connection with the aforementioned policies.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter an Order as follows:

1.      Declaring that the LINA Policy and/or The Hartford Policy cover Ms. Shaver for the subject disability.

2.      Declaring that LINA and/or Hartford provide Long Term Disability benefits to Ms. Shaver.

3.      Awarding Ms. Shaver her costs of suit, including reasonable attorney's fees.

4.      Granting such other and further relief as the Court may deem just and proper.

## AS FOR A SECOND CAUSE OF ACTION

120. Paragraphs 1-119 are hereby incorporated as if fully set forth herein.

121. In disclaiming coverage for disability benefits to Ms. Shaver, both Hartford and LINA have acted in an arbitrary and capricious and wrongful manner in the interpretation and application of the terms of their respective policies.

122. By virtue of the foregoing, Hartford and LINA have breached the terms of the Hartford and LINA Policies, respectively, of which Ms. Shaver is a beneficiary, and have thereby violated the requirements of ERISA, 29 U.S.C. §§ 1001 *et. seq*, 1132 *et. seq*, and 1133 *et seq.*, and the applicable regulations promulgated thereunder.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter an Order as follows:

1.      Declaring that the LINA Policy and/or The Hartford Policy cover Ms. Shaver for the subject disability.

2.      Declaring that LINA and/or Hartford provide Long Term Disability benefits to Ms. Shaver.

3.      Awarding Ms. Shaver her costs of suit, including reasonable attorney's fees.

4.      Granting such other and further relief as the Court may deem just and proper.

**AS FOR A THIRD CAUSE OF ACTION**

123.   Paragraphs 1-122 are hereby incorporated as if fully set forth herein.

124.   Even in the event that an adjudication finds that Hartford is a not a liable party in this litigation, LINA's denial of long term disability benefits to Ms. Shaver was without a basis in law or fact. The denial was against the substantial weight of the evidence, a breach of contract, arbitrary and capricious, and wrong.

125.   At all times relevant herein, LINA has failed to follow reasonable claims handling procedures as required by ERISA, 29 U.S.C. §§ 1132 and 1133 and the accompanying regulations in that LINA has ignored its own contract terms in denying benefits to Ms. Shaver and wholly ignored the substantial medical evidence entitling her to benefits under the LINA Policy.

126.   LINA's handling of Ms. Shaver's claim demonstrates that LINA was serving its own financial interests, despite its fiduciary obligations, in denying Ms. Shaver's claim.

127.   By virtue of the foregoing, LINA has breached the terms of the LINA Policy, and has violated the requirements of ERISA, 29 U.S.C. §§ 1001 *et. seq*, 1132 *et. seq*, and 1133 *et seq.*, and the applicable regulations promulgated thereunder.

128.   Plaintiff therefore brings this action pursuant to ERISA, 29 U.S.C.  § 1132(a)(1)(B) as to LINA.

**WHEREFORE**, Ms. Shaver requests that this Honorable Court enter an Order as follows:

1.      Declaring Ms. Shaver both totally disabled and entitled to/covered for benefits under the LINA Policy due to her documented physical impairments.

2.      Ordering LINA to pay Ms. Shaver's Long Term Disability benefits under the terms of LINA Policy.

3.      Ordering LINA to immediately pay all retroactive Long Term Disability benefits due and owing to Ms. Shaver.

4.      Awarding Ms. Shaver her costs of suit, including reasonable attorney's fees.

5.      Awarding Ms. Shaver interest on all unpaid benefits and waiving any and all premium charges accrued with respect to the LINA Policy.

6.      Granting such other and further relief as the Court may deem just and proper.

### AS FOR A FOURTH CAUSE OF ACTION

129.    Paragraphs 1-128 are hereby incorporated as if fully set forth herein.

130.    Even in the event that an adjudication finds that LINA is not a liable party in this litigation, Hartford's denial of long term disability benefits to Ms. Shaver was without a basis in law or fact. The denial was against the substantial weight of the evidence, a breach of contract, arbitrary and capricious, and wrong.

131.    At all times relevant herein, Hartford has failed to follow reasonable claims handling procedures as required by ERISA, 29 U.S.C. §§ 1132 and 1133 and the accompanying regulations in that Hartford has ignored its own contract terms in denying benefits to Ms. Shaver and wholly ignored the substantial medical evidence entitling her to benefits under the Hartford Policy.

132.    Hartford's handling of Ms. Shaver's claim demonstrates that Hartford were serving its own financial interests, despite its fiduciary obligations, in denying Ms. Shaver's claim.

133.    By virtue of the foregoing, Hartford has breached the terms of the LINA Policy, and has violated the requirements of ERISA, 29 U.S.C. §§ 1001 *et. seq*, 1132 *et. seq*, and 1133 *et. seq*, and the applicable regulations promulgated thereunder.

22

134.    Plaintiff therefore brings this action pursuant to ERISA, 29 U.S.C.  § 1132(a)(1)(B) as to Hartford.

**WHEREFORE**, Ms. Shaver requests that this Honorable Court enter an Order as follows:

1.    Declaring Ms. Shaver  totally disabled and entitled to/covered for benefits under the Hartford Policy due to her documented physical impairments.

2.    Ordering Hartford to pay Ms. Shaver's Long Term Disability benefits under the terms of the Hartford Policy.

3.    Ordering Hartford to immediately pay all retroactive Long Term Disability benefits due and owing to Ms. Shaver.

4.    Awarding Ms. Shaver her costs of suit, including reasonable attorney's fees.

5.    Awarding Ms. Shaver interest on all unpaid benefits and waiving any and all premium charges accrued with respect to the Hartford Policy.

6.    Granting such other and further relief as the Court may deem just and proper.

## <u>DESIGNATION OF TRIAL COUNSEL</u>

Plaintiff designates SARA KAPLAN-KHODOROVSKY, ESQ. as trial counsel.

## **CERTIFICATION**

I certify that the matters in controversy are not the subject of any other action or arbitration proceeding, now or contemplated, and that no other parties should be joined in this action.

Dated: 12-6-19                     By: _____

                                       Sara Elizabeth Kaplan, Esq.
                              Law Offices of Barbara B. Comerford, P.A.
                                       A Professional Corporation
                                      45 Eisenhower Drive, 2nd Floor
                                         Paramus, NJ 07652-1452
                                             201-485-8806
                                   Attorneys for Plaintiff Carrie Shaver